*PRELIMINARY PRINT*

VOLUME 599 U. S. PART 1
PAGES 762–812

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 23, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# UNITED STATES *v.* HANSEN

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 22–179.   Argued March 27, 2023—Decided June 23, 2023

Respondent Helaman Hansen promised hundreds of noncitizens a path to U. S. citizenship through "adult adoption."   But that was a scam. Though there is no path to citizenship through "adult adoption," Hansen earned nearly \$2 million from his scheme.   The United States charged Hansen with, *inter alia*, violating 8 U. S. C. § 1324(a)(1)(A)(iv), which forbids "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such [activity] is or will be in violation of law."   Hansen was convicted and moved to dismiss the clause (iv) charges on First Amendment overbreadth grounds.   The District Court rejected Hansen's argument, but the Ninth Circuit concluded that clause (iv) was unconstitutionally overbroad.

*Held*: Because § 1324(a)(1)(A)(iv) forbids only the purposeful solicitation and facilitation of specific acts known to violate federal law, the clause is not unconstitutionally overbroad.   Pp. 769–785.

   (a) Hansen's First Amendment overbreadth challenge rests on the claim that clause (iv) punishes so much protected speech that it cannot be applied to anyone, including him.   A court will hold a statute facially invalid under the overbreadth doctrine if the law "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep."   *United States* v. *Williams*, 553 U. S. 285, 292.   In such a circumstance, society's interest in free expression outweighs its interest in the statute's lawful applications.   Otherwise, courts must handle unconstitutional applications as they usually do—case-by-case.   Pp. 769–770.

   (b) The issue here is whether Congress used "encourage" and "induce" in clause (iv) as terms of art referring to criminal solicitation and facilitation (thus capturing only a narrow band of speech) or instead as those terms are used in ordinary conversation (thus encompassing a broader swath).   Pp. 770–774.

   (1) Criminal solicitation is the intentional encouragement of an unlawful act, and facilitation—*i. e.*, aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission.   Neither requires lending physical aid; for both, words may be enough.   And both require an intent to bring about a particular unlawful act.   The terms "encourage" and "induce," found in clause (iv), are

among the "most common" verbs used to denote solicitation and facilitation. 2 W. LaFave, Substantive Criminal Law § 13.2(a). Their specialized usage is displayed in the federal criminal code as well as the criminal laws of every State. If the challenged statute uses those terms as they are typically understood in the criminal law, an overbreadth challenge would be hard to sustain. Pp. 771–773.

(2) Hansen, like the Ninth Circuit, insists that clause (iv) uses "encourages" and "induces" in their ordinary rather than specialized sense. In ordinary parlance, "induce" means "[t]o lead on; to influence; to prevail on; to move by persuasion or influence," Webster's New International Dictionary 1269, and "encourage" means to "inspire with courage, spirit, or hope," Webster's Third New International Dictionary 747. If clause (iv) conveys these ordinary meanings, it arguably reaches abstract advocacy or general encouragement, and its applications to protected speech might render it vulnerable to an overbreadth challenge. Pp. 773–774.

(c) The Court holds that clause (iv) uses "encourages or induces" in its specialized, criminal-law sense—that is, as incorporating common-law liability for solicitation and facilitation. Pp. 774–778.

(1) Context indicates that Congress used those words as terms of art. "Encourage" and "induce" have well-established legal meanings— and when Congress "borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette* v. *United States*, 342 U. S. 246, 263. That inference is even stronger here, because clause (iv) prohibits "encouraging" and "inducing" *a violation of law*, which is the object of solicitation and facilitation too. The Ninth Circuit stacked the deck in favor of ordinary meaning, but it should have given specialized meaning a fair shake. When words have several plausible definitions, context differentiates among them. Here, the context of these words indicates that Congress used them as terms of art. Pp. 774–775.

(2) Statutory history is an important part of the relevant context. When Congress enacted in 1885 what would become the template for clause (iv), it criminalized "knowingly assisting, encouraging or soliciting" immigration under a contract to perform labor. 23 Stat. 333. Then, as now, "encourage" had a specialized meaning that channeled accomplice liability. And the words "assisting" and "soliciting," which appeared alongside "encouraging," reinforce the narrower criminal-law meaning. When Congress amended that provision in 1917, it added "induce," which also carried solicitation and facilitation overtones. 39 Stat. 879. In 1952, Congress enacted the immediate predecessor for clause (iv) and also simplified the language from the 1917 Act, dropping

the words "assist" and "solicit," and making it a crime to "willfully or knowingly encourag[e] or induc[e], or attemp[t] to encourage or induce, either directly or indirectly, the entry into the United States of . . . any alien . . . not lawfully entitled to enter or reside within the United States." 66 Stat. 229. Hansen believes these changes dramatically broadened the scope of clause (iv)'s prohibition on encouragement, but accepting that argument would require the Court to assume that Congress took a circuitous route to convey a sweeping—and constitutionally dubious—message. The better understanding is that Congress simply streamlined the previous statutory language. Critically, the terms Congress retained ("encourage" and "induce") substantially overlap in meaning with the terms it omitted ("assist" and "solicit"). Clause (iv) is thus best understood as a continuation of the past. Pp. 775–778.

(d) Hansen argues that the absence of an express *mens rea* requirement in clause (iv) means that the statute is not limited to solicitation and facilitation. But when Congress placed "encourages" and "induces" in clause (iv), the traditional intent associated with solicitation and facilitation was part of the package. The federal aiding and abetting statute works the same way: It contains no express *mens rea* requirement but implicitly incorporates the traditional state of mind required for aiding and abetting. *Rosemond* v. *United States*, 572 U. S. 65, 70–71. Clause (iv) is situated among other provisions that function in the same manner. See, *e. g.*, §§ 1324(a)(1)(A)(v)(I), (II). Since "encourages or induces" draws on the same common-law principles, clause (iv) also incorporates a *mens rea* requirement implicitly. Pp. 778–781.

(e) Finally, it bears emphasis that the canon of constitutional avoidance counsels the Court to adopt the Government's reading if it is at least "'fairly possible.'" *Jennings* v. *Rodriguez*, 583 U. S. ——, ——. P. 781.

(f) Section 1324(a)(1)(A)(iv) reaches no further than the purposeful solicitation and facilitation of specific acts known to violate federal law. So understood, it does not "prohibi[t] a substantial amount of protected speech" relative to its "plainly legitimate sweep." *Williams*, 553 U. S., at 292. It is undisputed that clause (iv) encompasses a great deal of nonexpressive conduct, which does not implicate the First Amendment at all, *e. g.*, smuggling noncitizens into the country. Because these types of cases are heartland clause (iv) prosecutions, the "plainly legitimate sweep" of the provision is extensive. To the extent clause (iv) reaches any speech, it stretches no further than speech integral to unlawful conduct, which is unprotected. See, *e. g.*, *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502. Hansen, on the other hand, fails to identify a single prosecution for ostensibly protected expression in the 70 years since Congress enacted clause (iv)'s immediate predecessor.

Instead, he offers a string of hypotheticals, all premised on the expansive ordinary meanings of "encourage" and "induce." None of these examples are filtered through the traditional elements of solicitation and facilitation—most importantly, the requirement that a defendant *intend* to bring about a specific result. Because clause (iv) does not have the scope Hansen claims, it does not produce the horribles he parades. Hansen also resists the idea that Congress can criminalize speech that solicits or facilitates a civil violation, and some immigration violations are only civil. But even assuming that clause (iv) reaches some protected speech, and even assuming that its application to all of that speech is unconstitutional, the ratio of unlawful-to-lawful applications is not lopsided enough to justify facial invalidation for overbreadth. Pp. 781–785.

25 F. 4th 1103, reversed and remanded.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a concurring opinion, *post*, p. 785. JACKSON, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined, *post*, p. 792.

*Principal Deputy Solicitor General Fletcher* argued the cause for the United States. On the briefs were *Solicitor General Prelogar*, *Assistant Attorney General Polite*, *Deputy Solicitors General Feigin* and *Gannon*, *Matthew Guarnieri* and *J. Benton Hurst.*

*Esha Bhandari* argued the cause for respondent. With her on the brief were *Heather E. Williams*, *Carolyn M. Wiggin*, *Jeffrey L. Fisher*, *David D. Cole*, and *Cecillia D. Wang.**

———————

*Briefs of *amici curiae* urging reversal were filed for the State of Montana et al. by *Austin Knudsen*, Attorney General of Montana, *Christian B. Corrigan*, Solicitor General, *Kathleen L. Smithgall*, Deputy Solicitor General, and *Peter M. Torstensen, Jr.*, Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Steve Marshall* of Alabama, *Treg Taylor* of Alaska, *Kristin K. Mayes* of Arizona, *Tim Griffin* of Arkansas, *Ashley Moody* of Florida, *Christopher M. Carr* of Georgia, *Raúl R. Labrador* of Idaho, *Theodore E. Rokita* of Indiana, *Brenna Bird* of Iowa, *Kris Kobach* of Kansas, *Daniel Cameron* of Kentucky, *Lynn Fitch* of Mississippi, *Andrew Bailey* of Missouri, *Mike Hilgers* of Nebraska, *Dave Yost* of Ohio, *Gentner F. Drummond* of Oklahoma, *Alan Wilson* of South Carolina, *Marty J. Jackley* of South Dakota, *Jonathan Skrmetti* of Tennessee, *Ken Paxton* of Texas, *Sean D. Reyes* of Utah,

Justice Barrett delivered the opinion of the Court.

A federal law prohibits "encourag[ing] or induc[ing]" illegal immigration.  8 U. S. C. § 1324(a)(1)(A)(iv).  After concluding that this statute criminalizes immigration advocacy and other protected speech, the Ninth Circuit held it unconstitutionally overbroad under the First Amendment.  That was error.  Properly interpreted, this provision forbids only the intentional solicitation or facilitation of certain unlawful acts.  It does not "prohibi[t] a substantial amount of protected speech"—let alone enough to justify throwing out the law's "plainly legitimate sweep."  *United States* v. *Williams*, 553 U. S. 285, 292 (2008).  We reverse.

## I

In 2014, Mana Nailati, a citizen of Fiji, heard that he could become a U. S. citizen through an "adult adoption" program run by Helaman Hansen.  Eager for citizenship, Nailati flew

*Jason Miyares* of Virginia, *Patrick Morrisey* of West Virginia, and *Bridget Hill* of Wyoming; and for the Immigration Reform Law Institute by *Lawrence J. Joseph* and *Christopher J. Hajec*.

Briefs of *amici curiae* urging affirmance were filed for the City and County of San Francisco, California, et al. by *Tara M. Steeley, Jaime M. Huling Delaye*, and *Molly Alarcon*; for Asian Americans Advancing Justice|AAJC et al. by *Niyati Shah* and *Emily T. Kuwahara*; for the Electronic Frontier Foundation et al. by *David Greene*; for the First Amendment Coalition et al. by *Penny Venetis*; for Immigration Representatives et al. by *William C. Perdue, Kolya D. Glick*, and *Sirine Shebaya*; for the National Association of Criminal Defense Lawyers et al. by *Stephen R. Sady, Jeffrey T. Green, Xiao Wang*, and *Meredith R. Aska McBride*; for Religious Organizations by *Matthew S. Hellman, David A. Strauss*, and *Sarah M. Konsky*; for the Reporters Committee for Freedom of the Press by *Bruce D. Brown*; and for The Rutherford Institute et al. by *Erin Glenn Busby, Lisa R. Eskow, Michael F. Sturley, John W. Whitehead*, and *Daniel M. Ortner*.

Briefs of *amici curiae* were filed for the Cato Institute by *Clark M. Neily III*; for Pfizer Inc., by *Douglas Hallward-Driemeier, Stefan P. Schropp*, and *Ilana H. Eisenstein*; and for Eugene Volokh by *Mr. Volokh, pro se*.

to California to pursue the program. Hansen's wife told Nailati that adult adoption was the "quickest and easiest way to get citizenship here in America." App. 88. For $4,500, Hansen's organization would arrange Nailati's adoption, and he could then inherit U. S. citizenship from his new parent. Nailati signed up.

It was too good to be true. There is no path to citizenship through "adult adoption," so Nailati waited for months with nothing to show for it. Faced with the expiration of his visa, he asked Hansen what to do. Hansen advised him to stay: "[O]nce you're in the program," Hansen explained, "you're safe. Immigration cannot touch you." *Id.*, at 92. Believing that citizenship was around the corner, Nailati took Hansen's advice and remained in the country unlawfully.

Hansen peddled his scam to other noncitizens too. After hearing about the program from their pastor, one husband and wife met with Hansen and wrote him a check for $9,000—initially saved for a payment on a house in Mexico— so that they could participate. Another noncitizen paid Hansen out of savings he had accumulated over 21 years as a housepainter. Still others borrowed from relatives and friends. All told, Hansen lured over 450 noncitizens into his program, and he raked in nearly $2 million as a result.

The United States charged Hansen with (among other crimes) violations of § 1324(a)(1)(A)(iv). That clause forbids "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." In addition to convicting him under clause (iv), the jury found that Hansen had acted "for the purpose of private financial gain," triggering a higher maximum penalty. App. 116; see § 1324(a)(1)(B)(i).

After the verdict came in, Hansen saw a potential way out. Another case involving § 1324(a)(1)(A)(iv), *United States* v. *Sineneng-Smith*, was pending before the Ninth Circuit, which had *sua sponte* raised the question whether the clause

was an unconstitutionally overbroad restriction of speech. 910 F. 3d 461, 469 (2018). Taking his cue from *Sineneng-Smith*, Hansen moved to dismiss the clause (iv) charges on First Amendment overbreadth grounds. The District Court rejected Hansen's argument and sentenced him.

While Hansen's appeal was pending, the Ninth Circuit held in *Sineneng-Smith* that clause (iv) is unconstitutionally overbroad. *Id.*, at 467–468. That holding was short-lived: We vacated the judgment, explaining that the panel's choice to inject the overbreadth issue into the appeal and appoint *amici* to argue it "departed so drastically from the principle of party presentation as to constitute an abuse of discretion." 590 U. S. ——, —— (2020). On remand, limited to the arguments that Sineneng-Smith had actually made, the Ninth Circuit affirmed her convictions. 982 F. 3d 766, 770 (2020). But Hansen's appeal was waiting in the wings, giving the Ninth Circuit a second chance to address the overbreadth question. It reprised its original holding in *Sineneng-Smith*.

As in *Sineneng-Smith*, the Ninth Circuit focused on whether clause (iv) is a narrow prohibition covering solicitation and facilitation of illegal conduct, or a sweeping ban that would pull in "statements or conduct that are likely repeated countless times across the country every day." 25 F. 4th 1103, 1110 (2022). It adopted the latter interpretation, asserting that clause (iv) criminalizes speech such as "encouraging an undocumented immigrant to take shelter during a natural disaster, advising an undocumented immigrant about available social services, telling a tourist that she is unlikely to face serious consequences if she overstays her tourist visa, or providing certain legal advice to undocumented immigrants." *Ibid.* Concluding that clause (iv) covers an "'alarming'" amount of protected speech relative to its narrow legitimate sweep, the Ninth Circuit held the provision facially overbroad. *Ibid.*

The Ninth Circuit denied the Government's petition for rehearing en banc over the dissent of nine judges. Judge

Bumatay, who wrote the principal dissent, attributed the panel's overbreadth concern to a misreading of the statute. See 40 F. 4th 1049, 1057–1058 (2022). Correctly interpreted, he explained, clause (iv) reaches only criminal solicitation and aiding and abetting. *Ibid.* On that reading, the provision raises no overbreadth problem because, "[e]ven if § 1324(a)(1)(A)(iv) somehow reaches protected speech, that reach is far outweighed by the provision's broad legitimate sweep." *Id.*, at 1072.

We granted certiorari. 598 U. S. —— (2022).

## II

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." Wisely, Hansen does not claim that the First Amendment protects the communications for which he was prosecuted. Cf. *Illinois ex rel. Madigan* v. *Telemarketing Associates, Inc.*, 538 U. S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud"). Instead, he raises an overbreadth challenge: He argues that clause (iv) punishes so much protected speech that it cannot be applied to *anyone*, including him. Brief for Respondent 9–10.

An overbreadth challenge is unusual. For one thing, litigants typically lack standing to assert the constitutional rights of third parties. See, *e. g.*, *Powers* v. *Ohio*, 499 U. S. 400, 410 (1991). For another, litigants mounting a facial challenge to a statute normally "must establish that *no set of circumstances* exists under which the [statute] would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987) (emphasis added). Breaking from both of these rules, the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied.

We have justified this doctrine on the ground that it provides breathing room for free expression. Overbroad laws

"may deter or 'chill' constitutionally protected speech," and if would-be speakers remain silent, society will lose their contributions to the "marketplace of ideas." *Virginia* v. *Hicks*, 539 U. S. 113, 119 (2003). To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak. *Williams*, 553 U. S., at 292. If the challenger demonstrates that the statute "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep," then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid. *Ibid.*; see *Hicks*, 539 U. S., at 118–119.

Because it destroys some good along with the bad, "[i]nvalidation for overbreadth is '"strong medicine"' that is not to be 'casually employed.'" *Williams*, 553 U. S., at 293. To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep. *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 14 (1988); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 800–801 (1984). In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case.

### III

### A

To judge whether a statute is overbroad, we must first determine what it covers. Recall that § 1324(a)(1)(A)(iv) makes it unlawful to "encourag[e] or induc[e] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."[1] The issue is

---

[1] Although the statutory terms are not coextensive, we use "alien" and "noncitizen" as rough equivalents here. See 8 U. S. C. § 1101(a)(3); *Barton* v. *Barr*, 590 U. S. —, —, n. 2 (2020).

whether Congress used "encourage" and "induce" as terms of art referring to criminal solicitation and facilitation (thus capturing only a narrow band of speech) or instead as those terms are used in everyday conversation (thus encompassing a broader swath). An overbreadth challenge obviously has better odds on the latter view.

1

We start with some background on solicitation and facilitation. Criminal solicitation is the intentional encouragement of an unlawful act. ALI, Model Penal Code § 5.02(1), p. 364 (1985) (MPC); 2 W. LaFave, Substantive Criminal Law § 11.1 (3d ed. 2022) (LaFave). Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission. See, *e. g.*, *Twitter, Inc.* v. *Taamneh*, 598 U. S. 471, 489–490 (2023). While the crime of solicitation is complete as soon as the encouragement occurs, see LaFave § 11.1, liability for aiding and abetting requires that a wrongful act be carried out, see *id.*, § 13.2(a). Neither solicitation nor facilitation requires lending physical aid; for both, words may be enough. *Reves* v. *Ernst & Young*, 507 U. S. 170, 178 (1993) (one may aid and abet by providing "'assistance rendered by words, acts, encouragement, support, or presence'"); MPC § 5.02(2), at 365 (solicitation may take place through words or conduct); LaFave § 11.1(c) (same). Both require an intent to bring about a particular unlawful act. See, *e. g.*, *Hicks* v. *United States*, 150 U. S. 442, 449 (1893) ("[W]ords of encouragement and abetting must" be used with "the intention as respects the effect to be produced"). And both are longstanding criminal theories targeting those who support the crimes of a principal wrongdoer. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 181 (1994); LaFave § 11.1(a).

The terms "encourage" and "induce" are among the "most common" verbs used to denote solicitation and facilitation. *Id.*, § 13.2(a); see also 1 J. Ohlin, Wharton's Criminal Law

§ 10:1, p. 298 (16th ed. 2021) (Wharton) ("[A]dditional language—such as *encourage*, counsel, and command—usually accompanies 'aid' or 'abet'" (emphasis added)). In fact, their criminal-law usage dates back hundreds of years. See 40 F. 4th, at 1062–1064 (opinion of Bumatay, J.). A prominent early American legal dictionary, for instance, defines "abet" as "[t]o *encourage* or set another on to commit a crime." 1 J. Bouvier, Law Dictionary 30 (1839) (emphasis added). Other sources agree. See, *e. g.*, Wharton § 10:1, at 298 ("'abet,'" at common law, meant "to *encourage*, advise, or instigate the commission of a crime" (emphasis added)); Black's Law Dictionary 6 (1st ed. 1891) (to "abet" "[i]n criminal law" was "[t]o *encourage*, incite, or set another on to commit a crime" (emphasis added)); cf. *id.*, at 667 (11th ed. 2019) (defining "encourage" with, in part, a cross-reference to "aid and abet").

This pattern is on display in the federal criminal code, which, for over a century, has punished one who "induces" a crime as a principal. See Act of Mar. 4, 1909, § 332, 35 Stat. 1152 ("Whoever . . . aids, abets, counsels, commands, *induces*, or procures [the commission of an offense] is a principal" (emphasis added)); 18 U. S. C. § 2(a) (listing the same verbs today). The Government offers other examples as well: The ban on soliciting a crime of violence penalizes those who "solici[t], comman[d], *induc[e]*, or otherwise endeavo[r] to persuade" another person "to engage in [the unlawful] conduct." § 373(a) (emphasis added). Federal law also criminalizes "persuad[ing], *induc[ing]*, entic[ing], or coerc[ing]" one "to engage in prostitution" or other unlawful sexual activity involving interstate commerce. §§ 2422(a), (b) (emphasis added). The Model Penal Code echoes these formulations, defining solicitation as, in relevant part, "command-[ing], *encourag[ing]* or request[ing] another person to engage in specific [unlawful] conduct." MPC § 5.02(1), at 364 (emphasis added). And the commentary to the Model Penal Code notes that similar prohibitions may employ other verbs, such as "induce." See *id.*, Comment 3, at 372–373, n. 25 (collecting examples).

The use of both verbs to describe solicitation and facilitation is widespread in the States too. Nevada considers "[e]very person" who "aided, abetted, counseled, *encouraged*, hired, commanded, *induced* or procured" an offense to be a principal. Nev. Rev. Stat. §195.020 (2021) (emphasis added). Arizona provides that one who "commands, *encourages*, requests, or solicits another person to engage in specific conduct" commits the offense of solicitation. Ariz. Rev. Stat. Ann. §13–1002(A) (2020) (emphasis added). And New Mexico imposes criminal liability on one who "with the intent" for another to commit a crime "solicits, commands, requests, *induces* . . . or otherwise attempts to promote or facilitate" the offense. N. M. Stat. Ann. §30–28–3(A) (2018) (emphasis added). These States are by no means outliers—"induce" or "encourage" describe similar offenses in the criminal codes of *every* State. App. to Brief for State of Montana et al. as *Amici Curiae* 1–44; see, *e. g.*, Ala. Code §13A–2–23(1) (2015) ("induces"); Colo. Rev. Stat. §18–1–603 (2022) ("encourages"); Fla. Stat. §777.04(2) (2022) ("encourages"); Haw. Rev. Stat. §705–510(1) (2014) ("encourages"); Ind. Code §35–41–2–4 (2022) ("induces"); Kan. Stat. Ann. §21–5303(a) (2020) ("encouraging"); N. D. Cent. Code Ann. §12.1–06–03(1) (2021) ("induces"); Tex. Penal Code Ann. §7.02(a)(2) (West 2021) ("encourages"); W. Va. Code Ann. §61–11–8a(b)(1) (Lexis 2020) ("inducement"); Wyo. Stat. Ann. §6–1–302(a) (2021) ("encourages").

In sum, the use of "encourage" and "induce" to describe solicitation and facilitation is both longstanding and pervasive. And if 8 U. S. C. §1324(a)(1)(A)(iv) refers to solicitation and facilitation as they are typically understood, an overbreadth challenge would be hard to sustain.

2

Hansen, like the Ninth Circuit, insists that clause (iv) uses "encourages" and "induces" in their ordinary rather than their specialized sense. While he offers definitions from multiple dictionaries, the terms are so familiar that two sam-

ples suffice.   In ordinary parlance, "induce" means "[t]o lead on; to influence; to prevail on; to move by persuasion or influence."   Webster's New International Dictionary 1269 (2d ed. 1953).   And "encourage" means to "inspire with courage, spirit, or hope."   Webster's Third New International Dictionary 747 (1966).

In Hansen's view, clause (iv)'s use of the bare words "encourages" or "induces" conveys these ordinary meanings. See Brief for Respondent 14.   "[T]hat encouragement can *include* aiding and abetting," he says, "does not mean it is *restricted* to aiding and abetting."   *Id.*, at 25.   And because clause (iv) "proscribes encouragement, full stop," *id.*, at 14, it prohibits even an "op-ed or public speech criticizing the immigration system and supporting the rights of long-term undocumented noncitizens to remain, at least where the author or speaker knows that, or recklessly disregards whether, any of her readers or listeners are undocumented." *Id.*, at 17–18.   If the statute reaches the many examples that Hansen posits, its applications to protected speech might swamp its lawful applications, rendering it vulnerable to an overbreadth challenge.

B

We hold that clause (iv) uses "encourages or induces" in its specialized, criminal-law sense—that is, as incorporating common-law liability for solicitation and facilitation.   In truth, the clash between definitions is not much of a contest. "Encourage" and "induce" have well-established legal meanings—and when Congress "borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word."   *Morissette* v. *United States*, 342 U. S. 246, 263 (1952); see also, *e. g.*, *United States* v. *Shabani*, 513 U. S. 10, 13–14 (1994).

To see how this works, consider the word "attempts," which appears in clause (iv)'s next-door neighbors.   See §§ 1324(a)(1)(A)(i)–(iii).   In a criminal prohibition, we would

not understand "attempt" in its ordinary sense of "try." Webster's New Universal Unabridged Dictionary 133 (2d ed. 2001). We would instead understand it to mean taking "a substantial step" toward the completion of a crime with the requisite *mens rea*. *United States* v. *Resendiz-Ponce*, 549 U. S. 102, 107 (2007). "Encourages or induces" likewise carries a specialized meaning. After all, when a criminal-law term is used in a criminal-law statute, that—in and of itself— is a good clue that it takes its criminal-law meaning. And the inference is even stronger here, because clause (iv) prohibits "encouraging" and "inducing" *a violation of law*. See § 1324(a)(1)(A)(iv). That is the focus of criminal solicitation and facilitation too.

In concluding otherwise, the Ninth Circuit stacked the deck in favor of ordinary meaning. See 25 F. 4th, at 1109– 1110; see also *United States* v. *Hernandez-Calvillo*, 39 F. 4th 1297, 1304 (CA10 2022) ("Our construction of [the verbs in clause (iv)] begins with their ordinary meaning, not their specialized meaning in criminal law"). But it should have given specialized meaning a fair shake. When words have several plausible definitions, context differentiates among them. That is just as true when the choice is between ordinary and specialized meanings, see, *e. g.*, *Corning Glass Works* v. *Brennan*, 417 U. S. 188, 202 (1974) ("While a layman might well assume that time of day worked reflects one aspect of a job's 'working conditions,' the term has a different and much more specific meaning in the language of industrial relations"), as it is when a court must choose among multiple ordinary meanings, see, *e. g.*, *Muscarello* v. *United States*, 524 U. S. 125, 127–128 (1998) (choosing between ordinary meanings of "carry"). Here, the context of these words— the water in which they swim—indicates that Congress used them as terms of art.

Statutory history is an important part of this context. In 1885, Congress enacted a law that would become the template for clause (iv). That law prohibited "knowingly assist-

ing, *encouraging* or soliciting" immigration under a contract to perform labor. Act of Feb. 26, 1885, ch. 164, §3, 23 Stat. 333 (1885 Act) (emphasis added). Then, as now, "encourage" had a specialized meaning that channeled accomplice liability. See 1 Bouvier, Law Dictionary 30 ("abet" means "[t]o encourage or set another on to commit a crime"); Black's Law Dictionary 6 (1891) (to "abet" is "[t]o encourage, incite, or set another on to commit a crime"). And the words "assisting" and "soliciting," which appeared alongside "encouraging" in the 1885 Act, reinforce that Congress gave the word "encouraging" its narrower criminal-law meaning. See *Dubin* v. *United States*, 599 U. S. 110, 124–125 (2023) (a word capable of many meanings is refined by its neighbors, which often "'avoid[s] the giving of unintended breadth to the Acts of Congress'"). Unsurprisingly, then, when this Court upheld the 1885 Act against a constitutional challenge, it explained that Congress "has the power to punish any who *assist*" in introducing noncitizens into the country—without suggesting that the term "encouraging" altered the scope of the prohibition. *Lees* v. *United States*, 150 U. S. 476, 480 (1893) (emphasis added).

In the ensuing decades, Congress both added to and subtracted from the "encouraging" prohibition in the 1885 Act. Throughout, it continued to place "encouraging" alongside "assisting" and "soliciting." See Act of Mar. 3, 1903, §5, 32 Stat. 1214–1215; Act of Feb. 20, 1907, §5, 34 Stat. 900. Then, in 1917, Congress added "induce" to the string of verbs. Act of Feb. 5, 1917, §5, 39 Stat. 879 (1917 Act) (making it a crime "to induce, assist, encourage, or solicit, or attempt to induce, assist, encourage, or solicit the importation or migration of any contract laborer . . . into the United States"). Like "encourage," the word "induce" carried solicitation and facilitation overtones at the time of this enactment. See Black's Law Dictionary 617 (1891) (defining "inducement" to mean "that which leads or tempts to the commission of crime"). In fact, Congress had just recently used the term in a catch-

all prohibition on criminal facilitation. See Act of Mar. 4, 1909, § 332, 35 Stat. 1152 ("Whoever . . . aids, abets, counsels, commands, *induces*, or procures [the commission of an offense], is a principal" (emphasis added)). And as with "encourage," the meaning of "induce" was clarified and narrowed by its statutory neighbors in the 1917 Act—"assist" and "solicit."

Congress enacted the immediate forerunner of the modern clause (iv) in 1952 and, in doing so, simplified the language from the 1917 Act. Most notably, the 1952 version dropped the words "assist" and "solicit," instead making it a crime to "willfully or knowingly encourag[e] or induc[e], or attemp[t] to encourage or induce, either directly or indirectly, the entry into the United States of . . . any alien . . . not lawfully entitled to enter or reside within the United States." Immigration and Nationality Act, § 274(a)(4), 66 Stat. 229. Three decades later, Congress brought 8 U. S. C. § 1324(a)(1)(A)(iv) into its current form—still without the words "assist" or "solicit." Immigration Reform and Control Act of 1986, § 112(a), 100 Stat. 3382 (making it a crime to "encourag[e] or induc[e] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law").

On Hansen's view, these changes dramatically broadened the scope of clause (iv)'s prohibition on encouragement. Before 1952, he says, the words "assist" and "solicit" may have cabined "encourage" and "induce," but eliminating them severed any connection the prohibition had to solicitation and facilitation. Brief for Respondent 25–26. In other words, Hansen claims, the 1952 and 1986 revisions show that Congress opted to make "protected speech, not conduct, a crime." *Id.*, at 27.

We do not agree that the mere removal of the words "assist" and "solicit" turned an ordinary solicitation and facilitation offense into a novel and boundless restriction on speech.

Hansen's argument would require us to assume that Congress took a circuitous route to convey a sweeping—and constitutionally dubious—message. The better understanding is that Congress simply "streamlined" the pre-1952 statutory language—which, as any nonlawyer who has picked up the U. S. Code can tell you, is a commendable effort. 40 F. 4th, at 1066 (opinion of Bumatay, J.). In fact, the streamlined formulation mirrors this Court's own description of the 1917 Act, which is further evidence that Congress was engaged in a cleanup project, not a renovation. See *United States* v. *Lem Hoy*, 330 U. S. 724, 727 (1947) (explaining that the 1917 Act barred "contract laborers, defined as persons *induced or encouraged* to come to this country by offers or promises of employment" (emphasis added)); *id.*, at 731 (describing the 1917 Act as a "prohibition against employers *inducing* laborers to enter the country" (emphasis added)). And critically, the terms that Congress retained ("encourage" and "induce") substantially overlap in meaning with the terms it omitted ("assist" and "solicit"). LaFave § 13.2(a). Clause (iv) is best understood as a continuation of the past, not a sharp break from it.

C

Hansen's primary counterargument is that clause (iv) is missing the necessary *mens rea* for solicitation and facilitation. Brief for Respondent 28–31. Both, as traditionally understood, require that the defendant specifically intend that a particular act be carried out. *Supra*, at 771. "Encourages or induces," however, is not modified by any express intent requirement. Because the text of clause (iv) lacks that essential element, Hansen protests, it cannot possibly be limited to either solicitation or facilitation.

Once again, Hansen ignores the longstanding history of these words. When Congress transplants a common-law term, the "'old soil'" comes with it. *Taggart* v. *Lorenzen*, 587 U. S. ——, —— – —— (2019). So when Congress placed "encourages" and "induces" in clause (iv), the traditional in-

tent associated with solicitation and facilitation was part of the package. That, in fact, is precisely how the federal aiding-and-abetting statute works. It contains no express *mens rea* requirement, providing only that a person who "aids, abets, counsels, commands, induces or procures" a federal offense is "punishable as a principal." 18 U. S. C. § 2(a). Yet, consistent with "a centuries-old view of culpability," we have held that the statute implicitly incorporates the traditional state of mind required for aiding and abetting. *Rosemond* v. *United States*, 572 U. S. 65, 70–71 (2014).

Clause (iv) is situated among other provisions that work the same way. Consider those that immediately follow it: The first makes it a crime to "engag[e] in any conspiracy to commit any of the preceding acts," 8 U. S. C. § 1324(a)(1)(A)(v)(I), and the second makes it a crime to "ai[d] or abe[t] the commission of any of the preceding acts," § 1324(a)(1)(A)(v)(II). Neither of these clauses explicitly states an intent requirement. Yet both conspiracy and aiding and abetting are familiar common-law offenses that contain a particular *mens rea*. See *Rosemond*, 572 U. S., at 76 (aiding and abetting); *Ocasio* v. *United States*, 578 U. S. 282, 287–288 (2016) (conspiracy). Take an obvious example: If the words "aids or abets" in clause (v)(II) were considered in a vacuum, they could be read to cover a person who inadvertently helps another commit a § 1324(a)(1)(A) offense. But a prosecutor who tried to bring such a case would not succeed. Why? Because aiding and abetting implicitly carries a *mens rea* requirement—the defendant generally must *intend* to facilitate the commission of a crime. LaFave § 13.2(b). Since "encourages or induces" in clause (iv) draws on the same common-law principles, it too incorporates them implicitly.[2]

_____

[2] The Ninth Circuit believed that the Government's "solicitation and facilitation" reading of clause (iv) would create impermissible surplusage with the aiding-and-abetting provision in clause (v)(II). 25 F. 4th 1103, 1108–1109 (2022). Hansen does not press that argument before this

Still, Hansen reiterates that if Congress had wanted to require intent, it could easily have said so—as it did elsewhere in clause (iv). The provision requires that the defendant encourage or induce an unlawful act *and* that the defendant "kno[w]" or "reckless[ly] disregard" the fact that the act encouraged "is or will be in violation of law." § 1324(a)(1)(A)(iv). Yet while Congress spelled out this requirement, it included no express *mens rea* element for "encourages or induces." Indeed, Hansen continues, the statute used to require that the encouragement or inducement be committed "willfully or knowingly," but Congress deleted those words in 1986. Brief for Respondent 30. Taken together, Hansen says, this evidence reflects that Congress aimed to make a defendant liable for "encouraging or inducing" without respect to her state of mind.

But there is a simple explanation for why "encourages or induces" is not modified by an express *mens rea* requirement: There is no need for it. At the risk of sounding like a broken record, "encourage" and "induce," as terms of art, carry the usual attributes of solicitation and facilitation—including, once again, the traditional *mens rea*. Congress might have rightfully seen the express *mens rea* requirement as unnecessary and cut it in a further effort to streamline clause (iv). And in any event, the omission of the unnecessary modifier is certainly not enough to overcome the "presumption of scienter" that typically separates wrongful acts "from 'otherwise innocent conduct.'" *Xiulu Ruan* v. *United States*, 597 U. S. ——, —— (2022); see also *Elonis* v. *United States*, 575 U. S. 723, 736–737 (2015).

Nor does the scienter applicable to a distinct element within clause (iv)—that the defendant "kno[w]" or "reckless[ly] disregard . . . the fact that" the noncitizen's "coming

---

Court—for good reason. Clause (iv) criminalizes the aiding and abetting of an immigration violation, whereas clause (v)(II) prohibits the aiding and abetting of "any of the preceding acts." In other words, clause (v)(II) applies to aiding and abetting a first-line *facilitator*. Another difference: Clause (iv) criminalizes not only facilitation, but solicitation too.

to, entry, or residence is or will be in violation of law"—tell us anything about the *mens rea* for "encourages or induces." Many criminal statutes do not require knowledge of illegality, but rather only "'factual knowledge as distinguished from knowledge of the law.'" *Bryan* v. *United States*, 524 U. S. 184, 192 (1998). So Congress's choice to specify a mental state for this element tells us something that we might not normally infer, whereas the inclusion of a *mens rea* requirement for "encourages or induces" would add nothing.

It bears emphasis that even if the Government's reading were not the best one, the interpretation is at least "'fairly possible'"—so the canon of constitutional avoidance would still counsel us to adopt it. *Jennings* v. *Rodriguez*, 583 U. S. ——, —— (2018). This canon is normally a valuable ally for criminal defendants, who raise the prospect of unconstitutional applications to urge a narrower construction. But Hansen presses the clause toward the most expansive reading possible, effectively asking us to apply a canon of "'constitutional collision.'" 40 F. 4th, at 1059 (opinion of Bumatay, J.). This tactic is understandable in light of the odd incentives created by the overbreadth doctrine, but it is also wrong. When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict.[3]

## IV

Section 1324(a)(1)(A)(iv) reaches no further than the purposeful solicitation and facilitation of specific acts known to violate federal law. So understood, the statute does not "prohibi[t] a substantial amount of protected speech" relative to its "plainly legitimate sweep." *Williams*, 553 U. S., at 292.

---

[3] The canon of constitutional avoidance is a problem for the dissent. Attempting to overcome it, JUSTICE JACKSON suggests that the canon has less force in the context of an overbreadth challenge. *Post*, at 807–808. Our cases offer no support for that proposition. In this context, as in others, ordinary principles of interpretation apply.

Start with clause (iv)'s valid reach. Hansen does not dispute that the provision encompasses a great deal of nonexpressive conduct—which does not implicate the First Amendment at all. Brief for Respondent 22–23. Consider just a few examples: smuggling noncitizens into the country, see *United States* v. *Okatan*, 728 F. 3d 111, 113–114 (CA2 2013); *United States* v. *Yoshida*, 303 F. 3d 1145, 1148–1151 (CA9 2002), providing counterfeit immigration documents, see *United States* v. *Tracy*, 456 Fed. Appx. 267, 269–270 (CA4 2011) (*per curiam*); *United States* v. *Castillo-Felix*, 539 F. 2d 9, 11 (CA9 1976), and issuing fraudulent Social Security numbers to noncitizens, see *Edwards* v. *Prime, Inc.*, 602 F. 3d 1276, 1295–1297 (CA11 2010). A brief survey of the Federal Reporter confirms that these are heartland clause (iv) prosecutions. See 40 F. 4th, at 1072 (opinion of Bumatay, J.) (listing additional examples, including arranging fraudulent marriages and transporting noncitizens on boats). So the "plainly legitimate sweep" of the provision is extensive.

When we turn to the other side of the ledger, we find it pretty much blank. Hansen fails to identify a single prosecution for ostensibly protected expression in the 70 years since Congress enacted clause (iv)'s immediate predecessor. Instead, he offers a string of hypotheticals, all premised on the expansive ordinary meanings of "encourage" and "induce." In his view, clause (iv) would punish the author of an op-ed criticizing the immigration system, "[a] minister who welcomes undocumented people into the congregation and expresses the community's love and support," and a government official who instructs "undocumented members of the community to shelter in place during a natural disaster." Brief for Respondent 16–19. Yet none of Hansen's examples are filtered through the elements of solicitation or facilitation—most importantly, the requirement (which we again repeat) that a defendant *intend* to bring about a specific result. See, *e. g.*, *Rosemond*, 572 U. S., at 76. Clause (iv) does not have the scope Hansen claims, so it does not produce the horribles he parades.

To the extent that clause (iv) reaches *any* speech, it stretches no further than speech integral to unlawful conduct.[4] "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949). Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected. *Williams*, 553 U. S., at 298. We have applied this principle many times, including to the promotion of a particular piece of contraband, *id.*, at 299, solicitation of unlawful employment, *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 388 (1973), and picketing with the "sole, unlawful [and] immediate objective" of "induc-[ing]" a target to violate the law, *Giboney*, 336 U. S., at 502. It applies to clause (iv) too.[5]

Hansen has no quibble with that conclusion to the extent that clause (iv) criminalizes speech that solicits or facilitates a *criminal* violation, like crossing the border unlawfully or remaining in the country while subject to a removal order. See §§ 1253(a), 1325(a), 1326(a). He agrees that these applications of § 1324(a)(1)(A)(iv) are permissible—in fact, he con-

---

[4] We also note that a number of clause (iv) prosecutions (like Hansen's) are predicated on fraudulent representations through speech for personal gain. See, *e. g.*, *United States* v. *Sineneng-Smith*, 982 F. 3d 766, 776 (CA9 2020); *United States* v. *Kalu*, 791 F. 3d 1194, 1198–1199 (CA10 2015). "[F]alse claims [that] are made to effect a fraud or secure moneys or other valuable considerations" are not protected by the First Amendment. *United States* v. *Alvarez*, 567 U. S. 709, 723 (2012) (plurality opinion). These examples increase the list of lawful applications.

[5] Overbreadth doctrine traffics in hypotheticals, so we do not (and cannot) hold that *all* future applications of clause (iv) will be lawful, nor do we suggest that they will necessarily fall into the speech-integral-to-conduct category. That would require a crystal ball. Nothing in our opinion today precludes a litigant from bringing an as-applied challenge to clause (iv) in the future—whether based on the First Amendment or another constitutional constraint.

cedes that he would lose if clause (iv) covered only solicitation and facilitation of criminal conduct. Tr. of Oral Arg. 61–62. But he resists the idea that the First Amendment permits Congress to *criminalize* speech that solicits or facilitates a *civil* violation—and some immigration violations are only civil. Brief for Respondent 38. For instance, residing in the United States without lawful status is subject to the hefty penalty of removal, but it generally does not carry a criminal sentence. See *Arizona* v. *United States*, 567 U. S. 387, 407 (2012).

Call this the "mismatch" theory: Congress can impose criminal penalties on speech that solicits or facilitates a criminal violation and civil penalties on speech that solicits or facilitates a civil violation—but it cannot impose criminal penalties on speech that solicits or facilitates a civil violation. See Tr. of Oral Arg. 62–63; Brief for Eugene Volokh as *Amicus Curiae* 5–7. If this theory is sound, then clause (iv) reaches some expression that is outside the speech-integral-to-unlawful-conduct exception. Of course, "that speech is not categorically unprotected does not mean it is immune from regulation, but only that ordinary First Amendment scrutiny would apply." Brief for Respondent 44.

We need not address this novel theory, because even if Hansen is right, his overbreadth challenge fails. To succeed, he has to show that clause (iv)'s overbreadth is "*substantial* . . . relative to [its] plainly legitimate sweep." *Williams*, 553 U. S., at 292. As we have discussed, the provision has a wide legitimate reach insofar as it applies to nonexpressive conduct and speech soliciting or facilitating criminal violations of immigration law. Even assuming that clause (iv) reaches some protected speech, and even assuming that its application to all of that speech is unconstitutional, the ratio of unlawful-to-lawful applications is not lopsided enough to justify the "strong medicine" of facial invalidation for overbreadth. *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973). In other words, Hansen asks us to

throw out too much of the good based on a speculative shot at the bad. This is not the stuff of overbreadth—as-applied challenges can take it from here.

*    *    *

The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, concurring.

I join the Court's opinion in full. I write separately to emphasize how far afield the facial overbreadth doctrine has carried the Judiciary from its constitutional role. The facial overbreadth doctrine "purports to grant federal courts the power to invalidate a law" that is constitutional as applied to the party before it " 'if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " *Americans for Prosperity Foundation* v. *Bonta*, 594 U. S. ——, —— (2021) (THOMAS, J., concurring in part and concurring in judgment) (quoting *United States* v. *Sineneng-Smith*, 590 U. S. ——, —— (2020) (THOMAS, J., concurring)). As I have explained, this doctrine "lacks any basis in the text or history of the First Amendment, relaxes the traditional standard for facial challenges," and distorts the judicial role. *Id.*, at ——.

There is no question that the First Amendment does not shield respondent's scheme from prosecution under 8 U. S. C. § 1324(a)(1)(A)(iv), which prohibits "encourag[ing] or induc-[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." Respondent defrauded nearly 500 aliens by telling them that they could become U. S. citizens through adult adoption; he charged them up to $10,000 apiece, knowing full well that his scheme would not lead to citizenship. The

Page Proof Pending Publication

Ninth Circuit even acknowledged below that "it is clear," both "from previous convictions under the statute . . . and likely from [respondent's] conduct here, that [§ 1324(a) (1)(A)(iv)] has at least some 'plainly legitimate sweep.'" 25 F. 4th 1103, 1106–1107 (2022).

Yet, instead of applying Congress' duly enacted law to respondent, the Ninth Circuit held the statute unconstitutional under this Court's facial overbreadth doctrine. Specifically, it took the doctrine as license to "speculate about imaginary cases and sift through an endless stream of fanciful hypotheticals," from which it concluded that the statute may be unconstitutional as applied to other (hypothetical) individuals in other (hypothetical) situations. 40 F. 4th 1049, 1071 (2022) (Bumatay, J., dissenting from denial of rehearing en banc) (internal quotation marks omitted). It then tallied up those hypothetical constitutional violations and determined that they were "substantial" enough to warrant holding the law unconstitutional *in toto.* 25 F. 4th, at 1109–1111. That line of reasoning starkly demonstrates that this Court's facial overbreadth doctrine offers a license for federal courts to act as "roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 610–611 (1973) (majority opinion of White, J.).

Such "roving commissions" are hardly a new idea. When they met in 1787, the Constitution's Framers were well aware of a body that wielded such power: the New York Council of Revision (Council). Created by the New York Constitution of 1777, the Council consisted of the Governor, the Chancellor, and the judges of the New York Supreme Court. 2 B. Poore, The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the United States 1328, 1332 (2d ed. 1878). Noting that "laws inconsistent with the spirit of this constitution, or with the public good, may be hastily and unadvisedly passed," section III of the New York Constitution required the two Houses of the New York Legislature to present "all bills which have passed

the senate and assembly" to the "council for their revisal
and consideration."  *Ibid.*  The Council's power "to revise
legislation" meant that, if it "objected to any measure of a
bill, it would return a detailed list of its objections to the
legislature," which "could change the bill to conform to those
objections, override" them by a two-thirds vote of both
Houses, "or simply let the bill die."  J. Barry, Comment: The
Council of Revision and the Limits of Judicial Power, 56
U. Chi. L. Rev. 235, 245 (1989) (Barry) (emphasis deleted).[1]
The grounds for the Council's vetoes "ranged from an act
being 'inconsistent with the spirit of the Constitution' to an
act being passed without 'the persons affected thereby hav-
ing an opportunity of being heard'" to an act being "'incon-
sistent with the public good.'"  *Id.*, at 245–246 (alteration
and footnote omitted).

At first, the Council was a well-respected institution, and
several prominent delegates to the Philadelphia Convention
sought to replicate it in the Federal Constitution.  Resolu-
tion 8 of the Virginia Plan proposed a federal council of revi-
sion composed of "the Executive and a convenient number of
the National Judiciary" that would have "authority to exam-
ine [and veto] every act of the National Legislature before it
shall operate."  1 Records of the Federal Convention of
1787, §8, p. 21 (M. Farrand ed. 1911) (Farrand).  The Coun-
cil's veto would "be final . . . unless the Act of the National
Legislature be again passed."  *Ibid.*; see also J. Malcolm,
Whatever the Judges Say It Is?  The Founders and Judicial
Review, 26 J. L. & Politics 1, 30–33 (2010).

The proponents of a council were clear that they sought to
empower judges to pass upon not only the constitutionality
of laws, but also their policy.  One of the council's main sup-
porters, James Wilson, stated that the council would share

_____

[1] The term "revise" was understood to mean "[t]o review."  2 S. John-
son, A Dictionary of the English Language (4th ed. 1773); N. Bailey, A
Universal Etymological English Dictionary (22 ed. 1770) ("to review, to
look over again").

the New York Council's power of reviewing laws, not only on constitutional grounds, but also to determine if they were "unjust," "unwise," "dangerous," or "destructive." 2 Farrand 73. Such a power was needed, according to Wilson, because the ordinary judicial power of refusing to apply unconstitutional laws in cases or controversies did not include the authority to decline to give effect to a law on policy grounds. *Ibid.* The other leading proponent of a council, James Madison, similarly argued that the council would veto "laws unwise in their principle, or incorrect in their form." 1 *id.*, at 139. For Madison, the council was necessary to remedy the defect caused by the limits of judicial power: Judges could not prevent the "pursuit of . . . unwise & unjust measures." 2 *id.*, at 74. In that vein, George Mason similarly argued that a council was needed to prevent "unjust oppressive or pernicious" laws from taking effect. *Id.*, at 78.

Significantly, proponents of a council rejected the premise that judicial power included a power to refuse to apply a law for policy reasons. In fact, "[n]either side thought judges would or should be authorized to make policy—whether couched in the language of justice or rights—through their exercise of the judicial power. . . . [T]he debate over a council of revision was made necessary . . . because . . . not a single delegate on either side of the debate proposed or supported having judges perform a policymaking role from the bench." J. Anderson, Learning From the Great Council of Revision Debate, 68 Rev. Politics 79, 99–100 (2006). From that shared premise, the council's proponents argued that such an institution was needed precisely because it would be incompatible with judicial duty to take policy concerns into account in adjudicating cases. See J. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 963 (2018).[2]

---

[2] Later statements of the proposed council's supporters confirm their understanding that the judicial station is incompatible with making policy judgments. See *Moodie* v. *Ship Phoebe Anne*, 3 Dall. 319 (1796) (Elsworth, C. J.) ("Suggestions of policy and conveniency cannot be considered

Despite the support of respected delegates like Wilson and Madison, the Convention voted against creating a federal council of revision on four different occasions. P. Hamburger, Law and Judicial Duty 511 (2008). No other proposal was considered and rejected so many times. *Ibid.* Like the council's supporters, opponents of the proposal understood that the judicial power is only the authority to "resolve private disputes between particular parties," rather than "matters affecting the general public." Barry 255. Working from that shared premise, they reasoned that it was "'quite foreign from the nature of [the judicial] office to make them judges of the policy of public measures,'" as "'[n]o maxim was better established' than that 'the power of making ought to be kept distinct from that of expounding, the law.'" *Ibid.* (quoting 1 Farrand 97–98 (E. Gerry); 2 *id.*, at 75 (C. Strong)); see also 1 *id.*, at 140 (J. Dickinson). Indeed, opponents observed that "the Judges" were "of all men the most unfit to" have a veto on laws before their enactment. 2 *id.*, at 80 (J. Rutledge). This was so not only because judges could not be "presumed to possess any peculiar knowledge of the mere policy of public measures," *id.*, at 73 (N. Ghorum), but also because, to preserve judicial integrity, they "ought never to give their opinion on a law till it comes before them" as an issue for decision in a concrete case or controversy, *id.*, at 80 (J. Rutledge); see also *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 121 (2015) (Thomas, J., concurring in judgment) ("[J]udicial involvement in such a council would foster internal biases"). Opponents thus concluded that to include judges in the policy decisions inherent in the legislative process would be a "dangerous innovation," one that would erode public confidence in their ability to perform their "proper official character." 2 Farrand 75–76 (L. Martin); see also *id.*, at 77 ("[T]he Supreme Judiciary

_____

in the judicial determination of a question of right"); 8 Writings of James Madison 387 (G. Hunt ed. 1908) ("[Q]uestions of policy and expediency, are unsusceptible of judicial cognizance and decision").

should have the confidence of the people. This will soon be lost, if they are employed in the task of remonstrating ag[ainst] popular measures of the Legislature").

The later history of the New York Council of Revision demonstrates the wisdom of the Framers' decision. The Council naturally became politicized through its intrusive involvement in the legislative process. Over the course of its existence, it returned 169 bills to the legislature; the legislature, in turn, overrode only 51 of those vetoes and reenacted at least 26 bills with modifications. Barry 245. Moreover, "[t]he Council did not shrink from tough stands on controversial or politically charged issues." *Id.*, at 246. For example, early in its existence, it vetoed a bill barring those convicted of adultery from remarrying and one that declared Loyalists aliens. *Ibid.* Decades later, it very nearly blocked the bill authorizing the Erie Canal's construction for policy reasons. P. Bernstein, Wedding of the Waters: The Erie Canal and the Making of a Great Nation 197–199 (2005). Some members of the Council opposed the bill due to "concern[s] about committing the state to this huge project before public opinion was more clearly and more emphatically in favor." *Id.*, at 198. Others were concerned that the legislation gave the canal commission arbitrary powers. *Ibid.* The canal legislation—one of the most important measures in the Nation's history—survived the Council's review only because Chancellor James Kent changed his deciding vote at the last minute, seemingly on a whim. *Id.*, at 199.

The Council contributed to its own abolition in 1820, when it vetoed a bill passed by the legislature that called for a convention to revise New York's Constitution. 1 C. Lincoln, The Constitutional History of New York 623–626 (1906) (Lincoln). The State Assembly then issued a report lambasting "the Council for usurping the legislature's role as the democratic representative of the people"; the legislature subsequently enacted a new bill that succeeded in calling for

a constitutional convention. Barry 247; Lincoln 626–629. The same sentiment arose at the convention when, echoing arguments that had also been made in Philadelphia against a federal council of revision, opponents of the Council argued that it had "'usurped the power of judging the *expediency* as well as the constitutionality of bills passed by the legislature'" and that it had "'in fact become a third branch of the legislature.'" Barry 247 (quoting N. Carter & W. Stone, Reports of the Proceedings and Debates of the Convention of 1821, pp. 55, 79 (1821)). Unsurprisingly, the Council was abolished, and New York's 1821 Constitution placed the veto power solely in the Governor. Barry 248.

When courts apply the facial overbreadth doctrine, they function in a manner strikingly similar to the federal council of revision that the Framers rejected. The doctrine contemplates that courts can declare laws unconstitutional in the abstract without the law ever being applied against any individual in an unconstitutional manner. Along the way, courts must examine the sum total of the law's application to people who are not parties to any proceeding; courts then weigh the law's various applications to determine if any unconstitutional applications outweigh the law's constitutional sweep or might "chill" protected speech. That is nothing short of a society-wide policy determination of the sort that legislatures perform. Yet, the Court has never even attempted to ground this doctrine "in the text or history of the First Amendment." *Sineneng-Smith*, 590 U. S., at —–—— (concurring opinion). Instead, it has justified it "solely by reference to" yet another layer of "policy considerations and value judgments" about "what serves the public good." *Id.*, at ——–——. As the debate over the federal council of revision demonstrates, this approach is fundamentally inconsistent with judicial duty.

This case demonstrates just how far courts have drifted from their original station of adjudicating the rights of the

parties before them in accordance with law.[3] In an appropriate case, we should carefully reconsider the facial overbreadth doctrine.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting.

At bottom, this case is about how to interpret a statute that prohibits "encourag[ing] or induc[ing]" a noncitizen "to come to, enter, or reside in the United States" unlawfully. 8 U. S. C. § 1324(a)(1)(A)(iv). The Court reads that broad language as a narrow prohibition on the intentional solicitation or facilitation of a specific act of unlawful immigration—and it thereby avoids having to invalidate this statute under our well-established First Amendment overbreadth doctrine. But the majority departs from ordinary principles of statutory interpretation to reach that result. Specifically, it rewrites the provision's text to include elements that Congress once adopted but later removed as part of its incremental expansion of this particular criminal law over the last century.

It is neither our job nor our prerogative to retrofit federal statutes in a manner patently inconsistent with Congress's

---

[3] The facial overbreadth doctrine is but one manifestation of the Court's larger drift away from the limited judicial station envisioned by the Constitution. See J. Malcolm, Whatever the Judges Say It Is? The Founders and Judicial Review, 26 J. L. & Politics 1, 36–37 (2010). Justices have long noted that doctrines tasking judges with passing upon the policy of laws in the abstract resemble the council of revision the Framers rejected. See, *e. g.*, *Lewis* v. *New Orleans*, 415 U. S. 130, 136 (1974) (Blackmun, J., joined by Burger, C. J., and Rehnquist, J., dissenting) (overbreadth and vagueness doctrines); see also *Trimble* v. *Gordon*, 430 U. S. 762, 778 (1977) (Rehnquist, J., dissenting) (suspect classifications under the Fourteenth Amendment); *Griswold* v. *Connecticut*, 381 U. S. 479, 513–515 (1965) (Black, J., joined by Stewart, J., dissenting) (substantive due process); *Goldberg* v. *Kelly*, 397 U. S. 254, 273–274 (1970) (Black, J., dissenting) (due process for welfare benefits); *Saia* v. *New York*, 334 U. S. 558, 571 (1948) (Jackson, J., dissenting) (review of time, place, and manner speech regulations).

choices. Moreover, by acquiescing to the Government's newly minted pitch to narrow this statute in order to save it,[1] the majority undermines the goal of the overbreadth doctrine, which aims to keep overly broad statutes off the books in order to avoid chilling constitutionally protected speech. See *Dombrowski* v. *Pfister*, 380 U. S. 479, 486–487 (1965). Because the majority's interpretation of § 1324(a)(1)(A)(iv) diverges from the text and history of the provision, and simultaneously subverts the speech-protective goals of the constitutional doctrine plainly implicated here, I respectfully dissent.

I

Section 1324(a)(1)(A)(iv) makes it a federal crime to "encourag[e] or induc[e]" a noncitizen "to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." For ease of reference, I will refer to this as the "encouragement provision."

Respondent Hansen argues that the encouragement provision is unconstitutional under our First Amendment overbreadth doctrine, and the Ninth Circuit below agreed. Neither the Government nor the majority disputes that conclusion if the statute is read according to its plain terms. And, indeed, when read literally, the encouragement provision prohibits so much protected speech that it appears to qualify as overbroad under our precedents.

A

A statute is overbroad—and thus facially invalid—if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States* v. *Stevens*, 559 U. S. 460, 473 (2010) (internal

---

[1] Previously, even the Government rejected the majority's view of the statute's scope at trial, when it was seeking to convict the defendant. See Part III, *infra*.

quotation marks omitted). The overbreadth inquiry thus generally requires comparing the First Amendment-protected expression that a statute impermissibly punishes, on the one hand (let's call that "category one"), with the unprotected speech and conduct that the statute validly prohibits, on the other ("category two").

Starting with category one: With respect to the sweep of the plain text of the encouragement provision, there is no dispute that, "[i]n ordinary parlance, 'induce' means '[t]o lead on; to influence; to prevail on; to move by persuasion or influence,'" and "'encourage' means to 'inspire with courage, spirit, or hope.'" *Ante*, at 774. Thus, on its face, the encouragement provision's use of the terms "encourage" and "induce" seems to encompass any and all speech that merely persuades, influences, or inspires a noncitizen to come to, enter, or reside in this country in violation of law.

If speech of this nature is, in fact, sufficient to trigger potential prosecution under this statute, the provision would put all manner of protected speech in the Government's prosecutorial crosshairs. It would reach, for example, the grandmother who says she misses her noncitizen grandchild, leading the grandchild to move illegally to the United States. It would also apply to the doctor who informs a noncitizen patient that a necessary medical treatment is more readily available in the United States, influencing the patient to stay beyond the expiration of his visa to await treatment. The college counselor who advises an undocumented student that she can obtain a private scholarship to attend college in the United States, inspiring the student to reside here, would also fall within the scope of the statute.

The encouragement provision, on this broad reading, would also punish abstract advocacy of illegal conduct, even though such speech is plainly permissible under the First Amendment. For instance, the plain text of the statute appears to prohibit a person from saying to a noncitizen who has no authorization to reside here, "I encourage you to live

in the United States." But that speech is plainly protected. See *United States* v. *Williams*, 553 U. S. 285, 298–300 (2008). In *Williams*, this Court explained that "abstract advocacy" of child pornography—including the phrase "I encourage you to obtain child pornography"—qualifies as protected speech, even though the "recommendation of a particular piece of purported child pornography with the intent of initiating a transfer" is properly proscribed by federal statute. *Ibid.* (internal quotation marks omitted); see also, *e. g.*, *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 253 (2002) ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it").

## B

The Government does not dispute that the encouragement provision is unconstitutional as overbroad if it is read according to its plain text, thereby reaching these various fact patterns. This point is worth repeating: Under the broad interpretation of the statute, the Government does not even attempt to argue that the unconstitutional applications in category one are not "substantial," *Stevens*, 559 U. S., at 473, in relation to the constitutional applications that fall in category two.[2] Rather, the Government argues that the statute can be saved from falling victim to today's overbreadth challenge by construing the broad terms of the encouragement provision narrowly—and, in particular, reading them as authorizing prosecution only for solicitation or facilitation.

Citing this Court's general duty "to seek harmony, not to manufacture conflict," when "legislation and the Constitution brush up against each other," *ante*, at 781, the majority obliges. But this Court also has a duty to refrain from taking the legislative reins and revising the text of a statute.

---

[2] There is accordingly no need to dwell on the contents of category two here. The majority discusses several examples, like "issuing fraudulent Social Security numbers to noncitizens." *Ante*, at 782 (citing *Edwards* v. *Prime, Inc.*, 602 F. 3d 1276, 1295–1297 (CA11 2010)).

It is well established that "[w]e will not *rewrite* a law to conform it to constitutional requirements." *Stevens*, 559 U. S., at 481 (emphasis added; alterations and internal quotation marks omitted). Accordingly, and in the overbreadth context in particular, the Court "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Ibid.* (some internal quotation marks omitted).

Application of our ordinary principles of statutory interpretation here reveals that the encouragement provision is *not* susceptible to the narrow solicitation or facilitation construction that the majority adopts, as explained below. Thus, this statute is overbroad and facially invalid under the First Amendment.

## II

The majority contends that the encouragement provision uses " 'encourage' " and " 'induce' " in a "specialized, criminal-law sense," under which those words are essentially synonymous with solicitation and facilitation and carry certain narrowing features of those crimes. *Ante*, at 774. But that construction of the statute is untenable for the reasons that follow.

## A

The majority starts its interpretation of the encouragement provision "with some background on solicitation and facilitation," *ante*, at 771, instead of addressing any of the terms in the encouragement provision itself. This is the first clue that the majority's statutory analysis is unusual. Ordinarily, we start with the text of the statute being interpreted. Yet the words "solicitation" and "facilitation" appear nowhere in the encouragement provision. (As the majority notes, facilitation is "also called aiding and abetting," *ibid.*—another term that is absent from the encouragement provision.)

The majority goes on to explain that the terms that *do* appear in the encouragement provision—"encourage" and "induce"—are also often used (with other words) to define "solicitation" and "facilitation." *Ante*, at 771–773. For ex-

ample, the majority notes that one legal dictionary "defines 'abet' as '[t]o *encourage* or set another on to commit a crime,'" and it cites other legal dictionaries that also use "encourage" to define "abet." *Ante*, at 772. Similarly, the majority observes that the federal "ban on soliciting a crime of violence . . . penalizes those who 'solici[t], comman[d], *induc[e]*, or otherwise endeavo[r] to persuade' another person 'to engage in [the unlawful] conduct.'" *Ibid.* Because the terms "encourage" and "induce" are used to define the crimes of solicitation and facilitation, the majority concludes that the statutory terms "'[e]ncourage' and 'induce' have well-established legal meanings" that "incorporat[e] common-law liability for solicitation and facilitation." *Ante*, at 774.

This contention—that, because the broad terms that Congress actually used are sometimes spotted in the definition of other, narrower words, the statute's broad terms are limited by the meaning of those narrower words and those words' characteristics—is puzzling. The majority cites no precedent for this novel approach to interpreting words in a statute. And its logic falls apart in light of the English lexicon and how dictionary definitions tend to work.

Broad words are often used to define narrower ones. So the fact that a word is used to help define another word does not necessarily mean that the former is synonymous with the latter or incorporates all of its connotations. For instance, the word "furniture" might be used in the definition of a "chair," but not all pieces of furniture are chairs, nor do all pieces of furniture have four legs or other common chair-like characteristics. Similarly, "to move" is used to define "to walk," "to run," and "to fly." But that does not make these four terms interchangeable.

So, too, here. The phrase "encourages or induces" is not synonymous with "solicits" or "facilitates" (or "aids and abets"). For example, among the other characteristics of solicitation and facilitation (discussed further in Part II–C, *infra*) is the fact that they require "an *intent* to bring about a particular unlawful act," *ante*, at 771 (emphasis added). But

the encouragement provision hints at no such thing. It simply prohibits "encourag[ing] or induc[ing]" a noncitizen "to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." § 1324(a)(1)(A)(iv). Nor does the ordinary meaning of "encourages or induces" carry the intent requirement that solicitation and facilitation do: By describing the attractions of my hometown, for instance, I might end up inducing a listener to move there, even if that was not my intent.

It is also telling that the *very next* subdivision of § 1324(a)(1)(A) expressly prohibits "aid[ing] or abet[ting] the commission of any of the preceding acts." § 1324(a)(1)(A)(v)(II). That provision indicates that Congress knows how to create an aiding-and-abetting prohibition when it wants to—and that it did not do so in § 1324(a)(1)(A)(iv).[3]

The majority's mere observation that the encouragement provision's terms are used to define solicitation and facilitation is thus insufficient to establish that the terms mean the same thing or incorporate the same features.

B

The majority next turns to "[s]tatutory history" to support its transformation of the broad encouragement provision that Congress wrote into a narrow solicitation or aiding-and-abetting prohibition. *Ante*, at 775. I agree that the history of a statute can reveal Congress's intent to use terms in a narrower or specialized manner. But, here again, the particulars matter. And the history of this particular statute only underscores that it cannot be read as the majority

---

[3] This is not a surplusage argument. Cf. *ante*, at 779–780, n. 2. I agree with the majority that clause (iv) and clause (v)(II) have different aims. My point, instead, is that Congress's failure to use the classic "aids or abets" language in clause (iv), which it deploys just next door in clause (v)(II), should give us pause before concluding that we can read clause (iv) as if it included the same terms.

wishes. At every turn, Congress has sought to expand the reach of this criminal law, including by deleting the terms and *mens rea* requirement that the majority attempts to read back into the statute.

1

The history of the encouragement provision is a tale of expansion. Up first was an 1885 law focused specifically on contract labor. Ch. 164, 23 Stat. 332. It made "knowingly assisting, encouraging or soliciting the migration or importation of" a noncitizen into the United States "to perform labor or service of any kind under contract or agreement" unlawful. §3, *id.*, at 333. Congress revised this prohibition in 1917, to add "induce." §5, 39 Stat. 879. Thus, as of the early 20th century, it was a misdemeanor "to induce, assist, encourage, or solicit . . . the importation or migration of any contract laborer," or to attempt to do the same. *Ibid.*

Significantly for present purposes, in 1952, Congress *deleted* the statute's references to solicitation and assistance—leaving "encourages" and "induces" to stand alone. 66 Stat. 229. What is more, Congress expanded the prohibition to *all* unlawful entry, not merely contract labor. *Ibid.* And it also ratcheted up the punishment. *Ibid.* So amended, the statute made it a felony to "willfully or knowingly encourag[e] or induc[e], or attemp[t] to encourage or induce, either directly or indirectly, the entry into the United States" of any noncitizen who had not been "duly admitted" or who was not "lawfully entitled to enter or reside within the United States." *Ibid.*

Congress enacted the current version of the encouragement provision in 1986. It removed the *mens rea* requirement relating to the encouragement or inducement element—excising from the statute that a violator must "willfully or knowingly" encourage or induce a noncitizen to violate the immigration laws—while inserting a *mens rea* requirement for knowledge or reckless disregard of the noncitizen's immigration status. See Immigration Reform and Control Act of 1986, §112(a), 100 Stat. 3381–3382. Simulta-

neously, and for the first time, Congress made it a crime to encourage or induce an unauthorized noncitizen not merely to *enter* the United States, but also to encourage or induce such a person to "reside" here unlawfully. *Ibid.*

Finally, in 1996, Congress crafted a separate penalty enhancement for certain kinds of violations. It raised the maximum punishment from 5 years to 10 years of imprisonment if the offender violates the encouragement provision "for the purpose of commercial advantage or private financial gain." §1324(a)(1)(B)(i); see Illegal Immigration Reform and Immigrant Responsibility Act of 1996, §203(a), 110 Stat. 3009–565.

As these developments illustrate, Congress has repeatedly revisited the scope of the encouragement provision. And, in so doing, it has consistently expanded the reach and severity of this criminal law from its modest 1885 origins. Most notably, the particular amendments that Congress has made to the encouragement provision demonstrate its intent to specifically reject the pillars of the majority's holding.

To reiterate: The terms "solicit" and "assist" appeared in the text of the statute between 1885 and 1952, at which point Congress removed them. Likewise, between 1952 and 1986, violating this statute required that the speaker "willfully or knowingly" encourage or induce a noncitizen to transgress the immigration laws. But in 1986, Congress deleted this primary *mens rea* requirement.

2

The majority's efforts to spin the encouragement provision's enlightening enactment history in favor of the majority's narrow interpretation are unavailing.

The majority first points out that the 1885 version of the encouragement provision criminalized "knowingly *assisting*, encouraging or *soliciting*" certain immigration. §3, 23 Stat. 333 (emphasis added); see *ante*, at 775–776. Because the term "encouraging" was placed alongside "assisting" and

"soliciting" in this precursor provision, the majority maintains that the term "encouraging" is narrowed by the canon of *noscitur a sociis*, "which counsels that a word is given more precise content by the neighboring words with which it is associated." *Williams*, 553 U. S., at 294; see *ante*, at 776. In *Williams*, the Court (in an opinion by Justice Scalia) reasoned that, "[w]hen taken in isolation," the broad term "'promotes'" is "susceptible of multiple and wide-ranging meanings," but that, "in a list that includes 'solicits,' 'distributes,' and 'advertises,' [it] is most sensibly read to mean the act of recommending purported child pornography to another person for his acquisition." 553 U. S., at 294–295.

But, as the majority here ultimately goes on to acknowledge, *ante*, at 777, the statutory word "encouraging" was not actually accompanied by the narrower terms "soliciting" and "assisting" throughout the course of this statute's history. And for the history to be meaningfully referenced, the state of the statute must be considered over time, not just at particular points in which words that seem to support a particular reading might have appeared. The delta between the purportedly narrow version of the statute that the majority points to, and what later happened to the statutory text, is important—and there is no dispute that Congress later removed the terms "soliciting" and "assisting" from the encouragement provision, leaving "encouraging" and "inducing" to stand "in isolation," 553 U. S., at 294. See *ante*, at 777–778. Tracing the history over time clearly establishes that Congress deleted the very narrowing terms that the majority now reads back into the statute.[4]

---

[4] This revealing revision also sets apart the encouragement provision's unadorned use of "encourages" and "induces" from the majority's long list of state solicitation and facilitation laws. *Ante*, at 773. The majority includes that list in its effort to demonstrate that "encourages" and "induces" in the encouragement provision actually mean "solicits" or "aids and abets." But in the vast majority of the cited statutes, classic narrowing terms—like "aided," "abetted," "solicits," "commands," "hires," "coerces," or "compels"—appear alongside "encourages" or "induces." *Ibid.*;

The majority brushes off Congress's revision by speculating that Congress was merely "engaged in a cleanup project" and was just "streamlin[ing]" the statutory language. *Ante*, at 778. This contention, however, gets our ordinary presumption in statutory interpretation cases precisely backwards. We "usually presume differences in language . . . convey differences in meaning," absent some indication from Congress to the contrary. *BNSF R. Co.* v. *Loos*, 586 U. S. ——, —— (2019) (internal quotation marks omitted). Thus, we have found the presumption overcome where, for example, Congress has expressly "billed" the changes as "effect[-ing] only '[t]echnical [a]mendments.'" *Id.*, at ——.

Here, the majority points to no signal from Congress that it sought to change the encouragement provision's language without changing its meaning. It seems that the only support the majority can muster for its "cleanup project" theory is a 1947 Supreme Court case that at several points refers to the statute as a prohibition on "encourag[ing]" or "induc[ing]" certain unlawful immigration. *Ante*, at 778 (citing *United States* v. *Lem Hoy*, 330 U. S. 724 (1947)). From this, the majority infers that, when Congress amended the encouragement provision five years later to remove the words "solicit" and "assist," it must have been adopting *Lem Hoy*'s shorthand characterization of the statute. But the majority fails to support this connection—tenuous on its face—with any evidence that Congress actually consulted our 1947 decision when it drafted the 1952 amendments, or anything else that might establish the primary significance that the majority ascribes to our decision's phrasing.

The majority similarly characterizes Congress's decision to remove the intent requirement from the statute in 1986 as "a further effort to streamline" the encouragement provision. *Ante*, at 780. In other words, the Court today holds

see App. to Brief for State of Montana et al. as *Amici Curiae* 1–44. Thus, unlike the one before us, such statutes might well be susceptible of a narrower reading.

that Congress's removal of "willfully or knowingly" in the 1986 amendments did not change the *mens rea* required to violate this statute.  But the majority offers no support at all for its view that Congress didn't *really* mean for the amendment to effect any substantive change.  Instead, it conjures up its own "simple explanation": There was "no need" for an explicit *mens rea* because "encourage" and "induce" carry the *mens rea* associated with solicitation and facilitation.  *Ibid.* see also *ante*, at 778–779 (reasoning that Congress's use of "encourages" and "induces" brought along the "old soil" of "the traditional intent associated with solicitation and facilitation" (internal quotation marks omitted)).  Of course, this argument merely assumes that Congress intended for "encourage" and "induce" as they appear in the encouragement provision to mean "solicit" and "facilitate"; it is a repackaging of the majority's unwarranted conflation of those terms.  See Part II–A, *supra*.

The majority also invokes the presumption that a criminal law contains an intent requirement even where Congress does not explicitly include one.  *Ante*, at 780–781.  But, here, the statutory history undermines that presumption.  Congress most certainly focused on the *mens rea* question because it not only decided to remove "willfully or knowingly" from the statute, it did so while inserting a separate *mens rea* requirement for the knowledge of the noncitizen's immigration status.  The confluence of these choices implies that Congress's removal of the primary *mens rea* requirement was deliberate.  And, when this deliberate choice is considered alongside the history of the provision's significant expansions, there is ample cause to think that Congress intended a substantive change in meaning.

C

Other features of the encouragement provision (beyond its plain text and historical development) also suggest that Congress did not mean for the statute to be construed in accord-

ance with established characteristics of solicitation or aiding and abetting. These features further highlight the poor fit between this statute and the narrow solicitation/aiding-and-abetting box into which the majority tries to squeeze Congress's broad language.

Recall that, in 1986, Congress made it a crime to encourage or induce a noncitizen not just to "come to" or "enter" the United States, but also to "reside" in this country. 100 Stat. 3382; *supra*, at 799–800.[5] As the majority notes, while it is a crime for a noncitizen to *enter* the United States illegally, it is generally not a crime—just a civil violation—to *remain* in the United States without lawful status, such as when a noncitizen overstays a visitor or student visa. See *Arizona* v. *United States*, 567 U. S. 387, 407 (2012); see *ante*, at 784. Thus, the encouragement provision on its face appears to *criminally* punish someone who merely encourages or induces a *civil* violation.[6]

That feature of the provision does not sit easily with its categorization as a solicitation or facilitation statute, because, ordinarily, a person may only be held criminally liable

---

[5] As a side note: Congress's addition of "reside" might seem to sweep in speakers who encouraged or induced noncitizens "who were *already* unlawfully present in the U. S. to *continue* that unlawful presence." 40 F. 4th 1049, 1073, n. 1 (CA9 2022) (Collins, J., dissenting from denial of reh'g en banc). But as Judge Collins explained, the provision is "most naturally read" to reach only "those who encourage or induce particular [noncitizens] to *acquire* an unlawful presence or residence that they do not already have." *Ibid.* After all, "[o]ne does not normally speak of 'inducing' another to do what he or she is already doing." *Ibid.* And the principle of *noscitur a sociis* counsels in favor of such an understanding, given that "the first two listed verbs ('come to' and 'enter') plainly refer to such an acquisition." *Ibid.*

[6] Hansen takes issue with this feature of the statute, arguing that the "'speech integral to criminal conduct' exception" to the First Amendment's protection of free speech "does not permit the *criminal* punishment of speech encouraging only a *civil* law violation." Brief for Respondent 39. The majority declines to address this argument, leaving it available in future as-applied challenges to this and other statutes. *Ante*, at 783, n. 5, 784.

for aiding and abetting or solicitation when the underlying offense *is itself a crime.* Aiding-and-abetting liability is "a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond* v. *United States*, 572 U. S. 65, 70 (2014) (citing J. Hawley & M. McGregor, Criminal Law 81 (1899)); see also 18 U. S. C. § 2(a) (the general federal aiding-and-abetting statute, providing that someone who "aids, abets, counsels, commands, induces or procures" the commission of a federal crime "is punishable as a principal"). As for solicitation, at common law, the solicited offense had to be a felony or a serious misdemeanor; otherwise, "the solicitor [was] guilty of no offense." 1 J. Ohlin, Wharton's Criminal Law § 9:2 (16th ed. 2021) (Wharton's). Today, "in some jurisdictions, the offense solicited may be a felony or a misdemeanor; but in others, it can only be a felony"—either way, though, the underlying offense must be criminal. *Ibid.* (footnotes omitted); see also 18 U. S. C. § 373 (the general federal solicitation statute, which is limited to the solicitation of violent felonies).

Here, by contrast, the encouragement provision on its face appears to permit a person to be punished as a felon for merely encouraging a civil violation. Thus, the statute is not an easy fit for the solicitation and facilitation role in which the majority has cast it.

This statute is fundamentally different from aiding-and-abetting liability and solicitation in other ways as well. As noted, aiding-and-abetting liability is a form of vicarious liability—*i. e.*, a way in which a person becomes liable for the crimes of the principal. Likewise, for solicitation, "the punishment . . . is usually geared to . . . the punishment provided for the offense solicited." Wharton's § 9:11; see, *e. g.*, 18 U. S. C. § 373(a) (providing, for example, punishment of "not more than one-half the maximum term of imprisonment . . . of the crime solicited"). But, notably, a person who violates the encouragement provision is not punished as if he were a principal of the underlying offense, nor does the prescribed

punishment depend on the penalty for the underlying offense. So, for example, even if the underlying immigration offense is a civil violation, the person who encourages or induces that infraction could be punished by up to 10 years' imprisonment for violating the encouragement provision. Unlike solicitation and facilitation, then, punishment for violation of the encouragement provision is not tied in any way to the punishment prescribed for the underlying offense.

It is also telling that aiding-and-abetting liability (but not solicitation) requires that the principal *actually* commit the underlying offense. 2 W. LaFave, Substantive Criminal Law § 13.3(c) (3d ed. 2018) ("[T]he guilt of the principal must be established at the trial of the accomplice as a part of the proof on the charge against the accomplice"). Yet, the encouragement provision on its face does not require that a noncitizen actually enter or reside in the United States.

\*     \*     \*

For these reasons, none of the traditional tools of statutory interpretation makes the encouragement provision readily susceptible to the majority's narrowing construction.

## III

The majority nevertheless revises the statute, leaning on the canon of constitutional avoidance. *Ante*, at 781.[7] But that canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings* v. *Rodriguez*, 583 U. S. ——, —— (2018) (internal quotation marks omitted). It does not give the Court license "to rewrite a statute as it pleases." *Id.*, at ——. And, here, for the rea-

---

[7] The majority implies that constitutional avoidance is a backup argument. *Ante*, at 781 (suggesting that its reading of the statute is the "best one"). But, in my view, the text and history of the encouragement provision make it hard to get even close to the majority's narrow reading without substantial reliance on the constitutional-avoidance principle.

sons explained above, it is clear that the majority has mounted "a serious invasion of the legislative domain." *Stevens*, 559 U. S., at 481 (internal quotation marks omitted). The majority's rescue mission is especially problematic because it is taking place in the context of a First Amendment challenge to a statute on overbreadth grounds, as explained below.

A

Overbreadth challenges are an "exception to the usual rules governing standing," a variation the Court has long permitted in recognition of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *Dombrowski*, 380 U. S., at 486–487 (internal quotation marks omitted). Absent overbreadth doctrine, "the contours of regulation[s]" that impinge on the freedom of speech "would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of regulation." *Id.*, at 487. We thus allow defendants whose speech is constitutionally proscribed by a statute (like Hansen) to argue that the statute is nevertheless facially invalid under the First Amendment on the grounds that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U. S., at 473 (internal quotation marks omitted). By permitting this kind of challenge, the Court has "avoided making vindication of freedom of expression await the outcome of protracted litigation." *Dombrowski*, 380 U. S., at 487.

If this Court is willing to redline Congress's work to save it from unconstitutionality, it "sharply diminish[es] Congress's incentive to draft a narrowly tailored law in the first place," *Stevens*, 559 U. S., at 481 (internal quotation marks omitted), which runs directly counter to overbreadth's goal of limiting criminal laws that chill constitutionally protected speech. Thus, in the particular context of an overbreadth

challenge, countervailing constitutional concerns—namely, that constitutionally protected speech will be chilled—must be considered alongside the values that underpin our ordinary canon of constitutional avoidance.

Heavy reliance on constitutional avoidance where statutes would otherwise be facially overbroad also means that the broad language in the particular statute remains on the books—as compared to the alternative world, in which the Court holds the statute unconstitutional as facially overbroad and thereby prompts the enactment of a narrower replacement. Ordinary people confronted with the encouragement provision, for instance, will see only its broad, speech-chilling language. Even if they do consult this Court's decision, and do recognize that it substantially narrows the statute's scope, the Court's decision leaves many things about future potential prosecutions up in the air.

For example, one does not know from today's determination whether a noncitizen must actually complete the underlying offense of coming to, entering, or residing in the United States (à la aiding and abetting) or whether completion is not a prerequisite for prosecution (à la solicitation). This sort of uncertainty—the clarification of which, by the way, should be Congress's policy prerogative—may itself dissuade people from engaging in protected speech.[8] Thus, regardless of whether a potential speaker has the ability, means, and time to track down and interpret this decision (or hire a lawyer to do so) to understand what the law requires, the known unknowns of the majority's course portend further chill.

---

[8] The Government also struggled at oral argument before this Court to articulate what scenarios the statute would (and would not) reach under its theory. But it notably represented that it did not believe it could validly prosecute a son who reassures his noncitizen mother (who lives unlawfully in the United States with him and his family) that she is not a burden on them and that his children love having their grandmother around. See Tr. of Oral Arg. 35.

B

The majority attempts to downplay the encouragement provision's threat to free expression by highlighting that Hansen "fails to identify a single prosecution for ostensibly protected expression in the 70 years since Congress enacted clause (iv)'s immediate predecessor." *Ante*, at 782. But the purported lack of past prosecutions provides no comfort for several reasons.

The first is that we have already said as much—this Court squarely rejected that kind of argument when the Government raised it in a prior overbreadth challenge. In *Stevens*, the Government vigorously asserted that it had never brought a prosecution implicating the kind of protected expression that the plain text of the statute in question swept in, and that it did not intend to do so. 559 U. S., at 480. The Government "hi[t] this theme hard, invoking its prosecutorial discretion several times." *Ibid.* But we were not moved: Such a prosecution was permitted by the statute, we noted, and that was enough to make it a serious threat. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Ibid.*

Second, just as in *Stevens*, "[t]his prosecution is itself evidence of the danger in putting faith in Government representations of prosecutorial restraint." *Ibid.* At trial in this very case, the Government objected to Hansen's proposed jury instructions, which would have required, among other things, that the Government prove that Hansen intended the noncitizen in question to reside in the United States illegally. The Government's objection was telling. It was based on the argument that the proposed instructions added elements not found in the text of the statute itself. And the District Court was persuaded; it sided with the Government in that regard.[9] But now that the statute's validity hangs in the

---

[9] As the Government conceded during oral argument before this Court, given that its elements argument prevailed below, the instructions that the District Court gave to the jury in this case were legally erroneous.

balance, the Government has reversed course entirely—it now implores us to read into the statute the very element that it earlier opposed as atextual.  See Brief for United States 23–28.

This debacle exemplifies the real and ever-present risk of continuing to have facially overbroad criminal statutes on the books.   In its role as prosecutor, the Government often stakes out a maximalist position, only later to concede limits when the statute upon which it relies might be struck down entirely and the Government finds itself on its back foot.[10] I am not suggesting bad faith on anyone's part; these kinds of turnabouts might well be chalked up to institutional incentives and coordination challenges in a massive prosecutorial system.   But given these dynamics, the answer to whether the Government has, as of today, prosecuted Hansen's hypothetical scenarios may understandably provide cold comfort to those living and working with immigrants.

In any event, it makes little sense for the number of unconstitutional prosecutions to be the litmus test for whether speech is being chilled by a facially overbroad statute.   The number of people who have not exercised their right to speak out of fear of prosecution is, quite frankly, unknowable.

Moreover, criminal prosecutions are not the only method by which statutes can be wielded to chill free speech.   Hansen's *amici* detail how Customs and Border Protection (CBP) relied on the encouragement provision to justify its creation of a "watchlist" of potential speakers that CBP had compiled in connection with its monitoring of a large group of migrants—a list that included journalists simply reporting fac-

_____

See Tr. of Oral Arg. 11; see also *id.*, at 39–40 (acknowledging that the Court "should send the case back to the Ninth Circuit and let the Ninth Circuit decide what's appropriate in light of" the flawed instructions).

[10] The Court has seen similar moves in multiple cases just this Term. See *Ciminelli* v. *United States*, 598 U. S. 306, 316–317 (2023); *Percoco* v. *United States*, 598 U. S. 319, 332–333 (2023); *Dubin* v. *United States*, 599 U. S. 110, 115–116 (2023).

tual information about the group's progress. Brief for Reporters Committee for Freedom of the Press as *Amicus Curiae* 5–6. CBP allegedly compiled dossiers on those reporters and singled them out as targets for special screenings. *Ibid.* There can be no doubt that this kind of Government surveillance—targeted at journalists reporting on an important topic of public concern, no less—tends to chill speech, even though it falls short of an actual prosecution.

Hansen's *amici* also describe how a group of Members of Congress recently sent a letter to three religious organizations that help undocumented immigrants, directing the organizations to preserve documents and communications related to their work in advance of a potential congressional investigation into whether such organizations are "'harbor[ing], transport[ing], and *encourag[ing]* '" noncitizens to settle unlawfully in this country. Brief for Religious Organizations as *Amici Curiae* 34 (emphasis added). Again, this kind of letter invoking the language of the encouragement provision can plainly chill speech, even though it is not a prosecution (and, for that matter, even if a formal investigation never materializes).

The majority nevertheless derides the fears of Hansen and his *amici* as an overimaginative "parad[e]" of "horribles." *Ante*, at 782. But what may seem "fanciful" to this Court at great remove, *ante*, at 770, might well prove to be a significant obstacle for those on the ground who operate daily in the shadow of the law. The "gravity" of the encouragement provision's chilling effect is "underscored by the filings of . . . *amici curiae* in support of" Hansen—including briefs from lawyers, immigration advocacy organizations, religious and other charitable organizations, journalists, local governments, and nonprofit policy institutions from across the ideological spectrum. *Americans for Prosperity Foundation* v. *Bonta*, 594 U. S. ——, —— (2021).

The substantial concerns that *amici* from such diverse walks of life raise illustrate that the "deterrent effect feared

by" Hansen and his *amici* "is real and pervasive." *Id.*, at ——. Moreover, at the end of the day, those fears reflect a determination to view enacted statutes as serious business, and, essentially, to take Congress at its word. This Court should have done the same.

As written, the encouragement provision is overbroad. Therefore, it should have been deemed facially unconstitutional and invalid under the First Amendment, as the Ninth Circuit held.

Page Proof Pending Publication

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None